**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 93-1797

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

EDDIE FRANKLIN DOUGLAS, EDD C. DOUGLAS,
ALTONIO O'SHEA DOUGLAS, ELBERT DOUGLAS, JR.,
JAMES WELDON CAMPBELL, BURVON KING, ORPHEUS HILL,
ARTHUR JACKSON DOUGLAS, CHAUNCEY MOSLEY,
CYNTHIA TAMPLIN, WESLEY JAMES WILSON, MARY JANE FIKE,

Defendants-Appellants.

---

Appeals from the United States District Court
for the Northern District of Texas

---

May 7, 1996

Before DAVIS and PARKER, Circuit Judges, and BUNTON[1], District
Judge.

ROBERT M. PARKER, Circuit Judge:

Appellants were convicted of participating in a conspiracy to
manufacture and distribute cocaine base (crack cocaine) in Fort
Worth.  The conspiracy distributed approximately five kilograms of
crack cocaine each week for eighteen months during 1991-92.  A
twenty-count indictment was returned against twenty-four

---

District Judge of the Western District of Texas, sitting by
designation.

defendants.  Of these, seventeen were tried in a consolidated trial.  After a seven week trial, twelve were convicted of at least one count and now present grounds of error in this appeal.  (The counts of conviction and sentences of each appellant are set out in chart form in Appendix A to this opinion.)

## II. The *Batson*[2] challenge

a.  Factual background

All seventeen defendants were African-American.  Of the 147 persons on the venire panel, four were African-American.  One African-American was moved from the back of the panel to the front to place her within "striking range," with the agreement of the prosecutor.  Prior to voir dire, Appellants orally moved to quash the panel, contending that African-Americans were underrepresented.  The district court denied the motion but allowed as timely written motions on the same grounds.  Two African-Americans served on the petit jury finally selected.

Defense counsel asked during voir dire if the venire members would "have a concern" if an all white jury was selected in this case.  Williams, an African-American venireman said, "Yes, based on the practice of the U.S. Justice System."  Although no follow-up questions were put to Williams, the prosecutor struck him.  Appellants made a *Batson* motion, alleging that the prosecution's peremptory strike against Williams was racially motivated.  The district court found that a prima facie case of discrimination had

---

*Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

been made and asked the prosecutor to respond by articulating its reasons for striking Williams. The prosecutor stated that Williams had been struck because he

> expressed concerns about past practices of the government -- of the U.S. Judicial System. Your honor, we felt that that would increase the burden of proof on the government that would start us off--while not a legal strike, but it would start us off in a position with that particular juror where we might have a greater burden of proof or that he might look at our system whereas most of the prosecuting group is not a minority, that that was a permissible peremptory challenge that we felt that he would not serve as good as others.
> The main thing, Your honor, were his comments concerning the judicial system. We want jurors that have faith in and are -- the greater faith, the better as far as the government is concerned, in the judicial system.

The district court found the reason credible and race-neutral.

b.   Standard of review

The trial court's decision on the ultimate question of discriminatory intent is a finding of fact which is accorded great deference on appeal. *Hernandez v. New York*, 500 U.S. 352, 364, 111 S. Ct. 1859, 1868, 114 L. Ed. 2d 395 (1991).

c.   Was the Government's articulated reason race neutral?

The Government's explanation must be facially valid. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, ___U.S.___, 115 S. Ct. 1769, 1771, 131 L. Ed. 2d 834 (1995). The requirement that the reason be legitimate does not mean that it be persuasive or even plausible, but that it does not deny equal protection. *Id.* Appellants do not argue that the articulated reason was not credible. Rather, they argue that it was not race-neutral because the prosecutor projected a general

3

distrust of the justice system by African-Americans on an African-American juror who voiced concern about <u>past</u> problems with the U.S. justice system. The distinction drawn by Appellants between past concern and present concern is not self-evident in Williams' answer, quoted above, and adds no strength to their argument.

Appellants rely primarily on *United States v. Bishop,* 959 F.2d 820 (9th Cir. 1992), in which the Ninth Circuit held that the prosecutor's articulated reason for striking an African-American venire member was inadequate under *Batson*. The prosecutor explained that he struck the individual because she was poor and lived in a poor, violent area of Los Angeles where residents are anesthetized to violence and probably believe police "pick on" African-American people. The defendant established that the correlation between residence in that area of town and being African-American was very high and that the prosecutor's reason was a "surrogate for racial bias." The court held that the reason was not race-neutral because it was a generic reason and a group-based presumption that a poor African-American person could not fairly try an African-American defendant. As in this case, two African-Americans served on Bishop's jury.

Appellants contend that the prosecutor's reason was a generic reason, a group-based presumption, and a surrogate for racial bias. The Government responds that a group-based presumption or bias was not projected onto Williams because he personally articulated his distrust of the U.S. justice system. In support of the trial court's findings, the Government also points out that the

prosecutor agreed to allow one African-American venire member to be moved to the front of the panel and that two African-Americans served on the petit jury. Additionally, the Government used some strikes on whites.

Appellants next assert that a white venire member, identified as Juror Number 4, articulated concerns similar to Williams' and was not struck by the prosecutor. That argument is specious because she was excused prior to the Government's exercise of peremptory challenges.

Finally, Appellants argue that Wilson's articulated concern is precisely the concern voiced in *Batson*: "Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87, 106 S. Ct. at 1718. Their logic does not persuade us. *Batson* does not forbid striking a juror who holds a particular opinion about the U.S. justice system. Rather, it forbids striking jurors based on their race.

Under the "great deference" standard of review, the district court's decision must stand. Even though we find *Bishop*'s reasoning persuasive, it is easily distinguishable from this case because Williams' stated concern about the justice system removes the specter of generic reason or group based presumption. The prosecutor struck Williams because of a personal attitude expressed during voir dire, not because he assumed, based on race, that Williams held that attitude.

5

SELECTION OF THE VENIRE PANEL

Appellants complain that the district court erred in denying their motion to quash the venire panel for violation of the fair cross section requirement, their constitutional right to equal protection, the Jury Selection Act, and the Jury Plan for the Northern District of Texas.

a. Fair cross section argument

In order to prove a fair cross section violation,

> the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 668, 58 L. Ed. 2d 579 (1979). The district court held that Appellants failed to establish the second prong of a prima facie fair cross section violation because the evidence adduced at the hearing showed that African-Americans have been fairly and reasonably represented on venires in the Fort Worth division. Appellants presented evidence that the African-American population in the Fort Worth division is approximately 10.4%. That figure, which represents the percentage of African-Americans in the gross population of the division, is irrelevant for Sixth Amendment purposes, however, because the pertinent inquiry is the pool of African-Americans in the district who are eligible to serve as jurors. *United States v. Brummitt*, 665 F.2d 521, 529 (5th Cir. 1981), *cert. denied*, 456 U.S. 977, 102 S. Ct. 2244, 72 L. Ed. 852 (1982). Instead of the 10.4% figure,

the district court relied on Appellants' evidence that in a sampling done by the Administrative Office, 10% of the eligible jurors were African-American.  During the thirteen month period preceding the venire selection for this case, 7.66% of persons summoned to serve were African-American.  The district court held that the resulting 2.34% disparity was within the permissible parameters, relying on *United States v. Hawkins*, 661 F.2d 436, 442 (5th Cir. 1981) (holding that a 5.45% underrepresentation falls within the limits set forth by the Supreme Court and this Circuit), *cert. denied*, 459 U.S. 832, 102 S. Ct. 72, 74 L. Ed. 2d 71 (1982).

Appellants' argument on appeal cites a string of conflicting, and often irrelevant, statistics.  For example, African-Americans comprised 22.7% of the population in Fort Worth, Texas in 1980. The trial was in 1993, the Fort Worth division comprises more area than the city of Fort Worth, and raw population is not the same as eligible jurors.  In short, 22.7% is meaningless. Appellants offer no argument challenging the district court's reliance on the 10% and 7.66% figures, even citing those same statistics in their brief along with the other numbers.  The district court's finding that Appellants failed to make out a prima facie case of fair cross section violation was not in error.

b. Equal Protection

An opportunity for discrimination in the operation of the jury selection system, coupled with a lesser degree of under-

representation,[3] may establish a prima facie case of equal protection violation. *See Alexander v. Louisiana*, 405 U.S. 625, 630, 92 S. Ct. 1221, 1225, 31 L. Ed. 2d 536 (1972). The district court found, based on no significant opportunity to discriminate and an insubstantial degree of underrepresentation, that Appellants had not made out a prima facie case of equal protection violation. The district court went on to hold that even assuming a prima facie case had been demonstrated, it was rebutted by evidence showing that no discrimination occurred in the selection of this venire.

The jury clerk started with 200 names, randomly selected by a computer. Twenty-six people were summoned that were not on the original list of 200. Appellants imply that they were selected non-randomly, at the discretion of the jury clerk. The record shows that these twenty-six jurors had been selected randomly for previous service but had been granted postponements. Of the 226 jurors, sixty-one were excused or postponed and 165 were summoned for this venire; 145 showed up, along with two other jurors that had not received notices that they were excused. The jury clerk then called the twenty absent jurors, and the next day four additional jurors from the list of 165 summoned jurors showed up. One of these four jurors was African-American.

Appellants complain about both the summoning of twenty-six members who were postponed from previous panels and the jury clerk's phone calls to absent jurors. Appellants contend that

---

That is, lesser than that required in a fair cross section claim.

8

there was <u>opportunity</u> for discrimination because the clerk could have looked up the race of the jurors and chosen not to contact African-Americans, and that the equal protection clause requires some check on this opportunity. The Government responds that the long-standing policies of the court, including summoning postponed jurors and telephoning absent jurors, only insures that more of the jurors randomly selected actually appear to serve and does not skew the randomness of the panel.

Appellants are correct that the clerk could violate the court's policies, look up the race of certain jurors and selectively contact postponed or absent jurors. But the court's policy is to call every absent juror, and Appellants' evidence did not show that the jury clerk violated that policy. In fact, the process flushed out an additional African-American juror. Equal protection requires guards against arbitrary power in selecting venires. It does not require policing of the clerk's office employees to determine if they are violating court policies. Appellants' argument that the policy itself is discriminatory because African-Americans are less likely than whites to be available by phone during business hours was not supported by any evidence and is not so self-evident that the district court could have accepted it as a fact, without evidence. We find no error in the district court's ruling on equal protection.

c. Jury Selection Act/Jury Plan.

Appellants argue that the jury clerk's actions violated the Northern District of Texas' Jury Plan and the Jury Selection and

9

Service Act of 1968, 18 U.S.C. § 1861-78 ("the Act").  In the event of an unanticipated shortage of jurors, the Jury Plan requires the marshal to summon additional jurors selected at random from the qualified jury wheel.  The Act provides that

> the court may require the marshal to summon . . . jurors selected at random from the voter registration lists, lists of actual voters, or other lists specified in the plan, in a manner ordered by the court.

28 U.S.C. § 1866(f).  Technical violations of the Act must constitute "substantial failure to comply" in order for Appellants to prevail on this issue.  *United States v. Kennedy*, 548 F.2d 608, 611 (5th Cir.), *cert. denied*, 434 U.S. 865, 98 S. Ct. 199, 54 L. Ed. 2d 140 (1977).  Substantial failure has been defined as that which affects the "random nature or objectivity of the selection process." *Id.* at 612.

The district court found that the practice of telephoning already properly and randomly selected non-appearing jurors was in compliance with the Jury Plan and did not make out a substantial violation of the Act.  Appellants cite *Kennedy* for the proposition that the jury clerk's action in telephoning jurors in this case has been forbidden by the Fifth Circuit because it "introduces a significant element of nonrandomization into the selection process that not only technically violates, but substantially departs from the Act's requirements."  *Id.*  Although the language is accurately quoted, the practice condemned by the *Kennedy* opinion is the use of volunteer jurors rather than the practice of contacting them by phone.  *Id.* at 611.

Neither the contacting of absent jurors by phone nor the use

10

of "postponed" jurors "introduces a significant element of nonrandomization into the selection process." *Id.* at 612. Further, appellants have advanced no convincing argument for the proposition that the procedures used in this case violated the local Jury Plan. We therefore find no error in the district court's holding that the procedures complained of violated neither the Jury Selection Act, nor the Jury Plan.

DENIAL OF MOTION TO SEVER

Appellants contend that the district court abused its discretion in denying Appellants' motion to sever Appellants' trials. We review the denial of a motion for severance for abuse of discretion. *Zafiro v. United States*, 506 U.S. 534, 113 S. Ct. 933, 939, 122 L. Ed. 2d 317 (1993).

Appellants filed a motion to sever the trial based upon a concern about prejudicial overflow they believed would occur when seventeen defendants, many with the last name Douglas, were tried together in a seven week trial. Each appellant was indicted on fewer than all counts, and many were indicted only on the conspiracy count. In addition to overflow, Appellants were concerned about juror confusion.

Appellants have identified no specific prejudice. The district court instructed the jury to consider each count and each defendant separately. It appears that the jury followed that instruction, convicting some defendants of all charges, convicting some defendants of some of the counts and acquitting others entirely. Given the circumstances of this case, we find no abuse

11

of discretion in the district court's denial of Appellants' motion to sever.

## THE KNOCK AND ANNOUNCE RULE

Eddie Franklin Douglas moved to suppress evidence seized from 287 Morgan Road because he alleged that the officers violated the "knock and announce" rule, 18 U.S.C. § 3109. In his motion to suppress, Eddie Franklin Douglas alleged that the officers conducting the search stormed the residence, breaking down a gate and beating on the front door in an effort to break it open. He further alleged that Eddie Franklin Douglas interrupted their efforts to break down the door to the house when he opened the door to see what the beating noise was. The video tape of the search, admitted into evidence, shows the officers breaking down a gate, attaching a chain to the burglar bars on the door, attempting to pull those bars off with a police vehicle, and then attempting to force the door open. Eddie Franklin Douglas opened the kitchen door and was ordered at gunpoint to unlock the burglar bars on the door. The motion to suppress alleged that the police did not knock and announce and that there was no exigency or refusal of admittance that permitted the destructive entry.

The district court, finding that the video tape of the search supported the facts set out in the motion to suppress, assumed that Eddie Franklin Douglas's version of the facts was true. However, the district court denied the motion, finding that the officers complied with § 3109, as Eddies Franklin Douglas opened the door before it was broken down by government agents. This Court reviews

12

such a factual determination for clear error. *United States v. Ponce*, 8 F.3d 989, 995 (5th Cir. 1993).

The Government contends that there was no violation of § 3109. Alternatively, the Government argues that exigent circumstances excused the officers from complying with the statute, in that they believed Douglas was armed and dangerous and that he might destroy evidence such as drugs or records.

Section 3109 provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

An officer's failure to "knock and announce" when executing a search warrant is relevant to the Fourth Amendment reasonableness inquiry as well. *Wilson v. Arkansas,* ___U.S.___, 115 S. Ct. 1914, 131 L. Ed. 2d 976 (1995). Under both the Fourth Amendment and the "knock and announce" statute, defendants bear the initial burden of establishing that an unannounced entry actually occurred. *United States v. Mueller*, 902 F.2d 336, 344 (5th Cir. 1990). If this showing is made, it becomes the Government's burden to justify the search. *Id.; United States v. Shugart*, 889 F.Supp. 963, 972 (E.D. Tex. 1995). The rule requiring an officer to knock and announce serves several fundamental interests, including "(1) protecting law enforcement officers and household occupants from potential violence; (2) preventing the unnecessary destruction of private property; and (3) protecting people from unnecessary intrusion into their private activities." *United States v. Sagaribay*, 982 F.2d

13

906, 909 (5th Cir.), *cert. denied*, ___U.S.___, 114 S. Ct. 160, 126 L. Ed. 2d 120 (1993).

The question presented in this case is whether the officers' actions, prior to the time Douglas came to the door and they "announced" their identity and mission to him, amounted to "breaking open" the house. The Government cites *United States v. Grier*, 866 F.2d 908, 934-35 (7th Cir. 1989), *abrogated on other grounds*, *United States v. Durrive*, 902 F.2d 1221 (7th Cir. 1990), to support its position that an uncompleted attempt to break open an outer door of a house is not a violation of § 3109. In *Grier*, the officers attacked the outer door of a house with a sledgehammer without first knocking and identifying themselves and asking for admittance. The noise alerted the people inside the house, who went to the door and admitted the officers. The Seventh Circuit held that because the door was not broken down and the officers were admitted to the premises by the occupants, there was no violation of § 3109. We agree. Here, the officers did not break open any outer or inner door of the house prior to being admitted. Regardless of how reprehensible we find the gratuitous destruction of property, the trial court's holding that Eddie Franklin Douglas opened the door before the officers entered the house is not clearly erroneous. It follows that there was no violation of § 3109. For that reason, we need not reach the question of whether or not exigent circumstances existed that would have justified the officers' violation of § 3109 in this case.

14

MOTION TO SUPPRESS EDDIE FRANKLIN DOUGLAS'S STATEMENT

Eddie Franklin Douglas moved to suppress the statements he made to officers during the search of the Morgan Road residence, arguing that he was in custody, he was not given *Miranda*[4] warnings, he did not waive his rights and that the officers continued questioning him after he invoked his right to counsel. According to the officers, Douglas did not invoke his right to counsel before he made the statements. Douglas responded to brief questioning by two of the officers and also made stray statements to at least one other officer during the search. The district court denied the motion, finding that Douglas was not in custody and that he did not request a lawyer. This Court reviews the district court's factual determinations for clear error. *United States v. Restrepo*, 994 F.2d 173, 183 (5th Cir. 1993). However, the question of whether *Miranda*'s guarantees have been impermissibly denied to a criminal defendant is a matter of constitutional law, meriting *de novo* review. *United States v. Harrell*, 894 F.2d 120, 122-23 (5th Cir.), *cert. denied*, 498 U.S. 834, 111 S. Ct. 101, 112 L. Ed. 2d 72 (1990).

The crux of the issue is whether Douglas was subjected to custodial interrogation. If so, the statements must be suppressed on the basis of *Miranda*, and it will not be necessary to determine the factual question of whether he adequately invoked his right to counsel and so came within the purview of *Edwards v. Arizona*, 451

---

*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

15

U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) and *Minnick v. Mississippi*, 498 U.S. 146, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990).

The parties do not dispute that Douglas was not under formal arrest. In *United States v. Bengivenga*, 845 F.2d 593 (5th Cir.), *cert. denied*, 488 U.S. 924, 109 S. Ct. 306, 102 L. Ed. 2d 325 (1988), the Fifth Circuit, sitting *en banc*, set out the test for determining whether a particular set of facts amounts to custodial interrogation in the absence of formal arrest:

> The meaning of custody has been refined so the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest. The Supreme Court has also explained that the only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation. A suspect is therefore in custody for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.

*Id.* at 596 (quotations and citations omitted).

*Bengivenga* involved a ninety second pre-arrest interrogation at a routine citizenship checkpoint. In upholding the district court's denial of a motion to suppress statements made during that interrogation, the Fifth Circuit focused on four factors. First, the court noted the short period of interrogation, recognizing that brief stops mitigate against a belief that an arrest has occurred. *Id.* at 598. This Court has expressed concerns that detentions which last more than an hour "raise considerable suspicion," but declined to draw a bright line rule that an hour-long delay constitutes a *per se* custodial interrogation. *United States v.*

16

*Harrell*, 894 F.2d 120, 124 n. 1 (5th Cir. 1990). Second, the *Bengivenga* Court reasoned that the interrogation took place in a public environment that would not lead a reasonable person to believe that he was under formal arrest. *Bengivenga*, 845 F.2d at 599-600. Third, an encounter limited to one or two law enforcement officers mitigates the target's sense of vulnerability. *Id.* at 598. Fourth, the Court noted that a "fixed checkpoint" interrogation, such as immigration screening, decreases the fear a reasonable person would otherwise experience. *Id.* at 599. The Court went on to distinguish an investigative stop, which requires no *Miranda* warnings, from an arrest. A suspect seized in accord with the Fourth Amendment may be briefly questioned and, if justified, frisked for weapons. *Id.* Thus detention and questioning do not necessarily amount to custodial interrogation. *Id.*

During the search, Douglas was not handcuffed and he was free to wander around the grounds outside of his house. One officer testified that he told Douglas that he could leave, and that they wanted him to leave because he was "kind of in the way" of the officers who were executing the search warrant. Another officer testified that when Douglas asked if he could leave, the officer told Douglas he "preferred" that Douglas stay around to go over the property sheet at the end of the search. Another officer told Douglas that he was not under arrest unless there were guns in the house and he was a felon. In response, Douglas told the officers that there were guns in the house, although they had already discovered one gun, and Douglas later told another officer that he

17

had a felony record. A local law enforcement officer present during the search testified that he and one of his detectives were asked to stay out under the car port with Douglas and some of his family members, which he did. Testimony revealed that on two occasions during the search Douglas entered the residence and during those times he was escorted by officers. In addition, Douglas argues that the fact that the officers pointed their guns at him during the first few minutes of the search and the violence with which the officers entered the residence added to the coercive atmosphere and the perception that he was not free to go.

Applying the first *Bengivenga* factor, we must determine the length of the detention. Douglas was clearly detained initially, but gave no statements that he now seeks to suppress during that time. The two actual interrogations, which occurred later in the day, lasted a few minutes each. Nevertheless, the search went on for several hours, with Douglas in the presence of various officers during most of that time. However, given the testimony that Douglas was told that he could go, the length of time it took the officers to complete the search does not weigh against the Government. Rather, the actual interrogation -- lasting less than fifteen minutes altogether -- appears to qualify as a brief detention.

The second factor, the location of the search, weighs in favor of the Government's position because questioning in one's own home in the presence of other family members is less coercive than questioning in a station house or other official location.

Under the third factor, the number of officers involved must be considered. Testimony set the number of officers involved in the search at fifty. However, most of those officers had no contact with Douglas. He made statements to two different officers in response to questioning, and talked for several hours "about old times" with a local law enforcement officer whom he had known for more than twenty years while they were standing out under the carport. He had minimal contact with several of the other officers throughout the day. Under these circumstances, the number of officers involved weighs equally for both sides.

Fourth, we must compare the circumstances of the execution of a search warrant to that of an immigration checkpoint. This factor weighs in favor of Douglas, as a neutral, reasonable person would feel more fear when his home is raided by armed law officers at sunrise than if he was stopped at an immigration checkpoint.

With factors one and two favoring the Government, factor two being neutral and factor four weighing in favor of Douglas, we are not able to say that the district court erred in finding that the circumstances surrounding the statements did not amount to custodial interrogation.

The trial court's finding that Douglas did not invoke his right to counsel is also supported by the record. Douglas refers us to the video tape of the search which was admitted into evidence. Neither the video tape nor the testimony concerning the search bears out Douglas's factual assertion that he invoked his right to counsel during the search. It follows that the district

court did not err in denying his motion to suppress.

## SENTENCING GUIDELINES FOR COCAINE BASE

Appellants complain that the guidelines for cocaine base violate their rights to due process of law, equal protection and the Eighth Amendment. Appellants also claim that a downward departure was warranted. This Court has rejected attacks on the crack/powder discrepancies in the sentencing guidelines. *United States v. Fisher*, 22 F.3d 574 (5th Cir.) (rejecting an Eighth Amendment challenge), *cert. denied* ___ U.S. ___, 115 S. Ct. 529, 130 L. Ed. 2d 433 (1994); *United States v. Galloway*, 951 F.2d 64, 65 (5th Cir. 1992) (rejecting an equal protection argument); *United States v. Thomas*, 932 F.2d 1085, 1090 (5th Cir. 1992) (rejecting a due process challenge), *cert. denied,* 502 U.S. 1038, 112 S. Ct. 887, (1992).

Departures are appropriate only in the unusual case, where, although the guideline, by its terms, applies, the particular facts of the case differ from the heartland of cases considered by the commission. U.S.S.G. Ch.1, Pt. A, § 4(b). Appellants have advanced no theory which would distinguish their cases from the "heartland" on crack offenses. We find no merit in Appellants' attacks on the cocaine base sentencing guidelines.

## OTHER SENTENCING ISSUES

a. Standard of review

A district court need only be convinced by a preponderance of the evidence to make fact findings pursuant to the sentencing guidelines. *United States v. Casto*, 889 F.2d 562, 570 (5th Cir.

20

1989), *cert. denied*, 493 U.S. 1092, 110 S. Ct. 1164, 107 L. Ed. 2d 1067 (1990). This Court accepts the findings of fact of the district court unless they are clearly erroneous and gives due deference to the district court's application of the guidelines to the facts. 18 U.S.C. § 3742(e). Information relied on to determine the size of a drug conspiracy need have only "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3, p.s. The district court may rely on information contained in a presentence report if it has the required minimum indicium of reliability; a defendant has the burden to show that any such information is materially untrue. *United States v. Vela*, 927 F.2d 197, 201 (5th Cir.), *cert. denied*, 502 U.S. 917, 112 S. Ct. 322, 116 L. Ed. 2d 263 (1991).

b. Arthur Jackson Douglas ("Arthur")

A Government informant ("Brown") approached Arthur about selling some automobile tire rims to Arthur. No drugs were discussed at this meeting. Later, Brown met with "Joe Boy" Douglas and discussed buying some cocaine from Joe Boy and getting a price break if he threw in the tire rims Arthur wanted. Arthur was not present at this meeting. Later Brown met with Arthur and Kenneth Evans. At that meeting, Brown negotiated the price, including the tire rims, of <u>powder</u> cocaine to be purchased from Evans. Later, Evans and Brown met, without Arthur, and Brown purchased a bag of drugs that he discovered later contained crack cocaine instead of powder. Both Brown and an FBI agent testified that up until the actual purchase everyone thought the deal was for the sale of

powder cocaine.

Arthur's PSR suggested that Arthur was responsible for the entire amount of the "reasonably foreseeable jointly undertaken criminal activity, to the extent of more than 15 kilograms of cocaine base." The district court rejected that suggestion and held Arthur responsible for only the single transaction in which he personally participated. However, the district court sentenced Arthur based on the guidelines for crack. Arthur argues on appeal, as he did at sentencing, that he should have been sentenced on the basis of the powder cocaine guidelines. That would have reduced his offense level from 30 to 14. We agree. The record bears out Arthur's contention that there is no evidence to support the fact finding that he agreed, participated in, or could have reasonably foreseen that the transaction would involve crack instead of powder.

c. All other sentencing issues.

The other Appellants raise different permutations of challenges to the factual findings of the district court at sentencing. None of them merits discussion, as they are wholly without merit.

## 18 U.S.C. 924(c) CONVICTIONS

Edd C. Douglas, Wesley James Wilson, Altonio O'Shea Douglas, Cynthia Tamplin and Eddie Franklin Douglas contend that the evidence is not sufficient to sustain their convictions for violation of 18 U.S.C. § 924(c), in light of *Bailey v. United States*, ___ U.S. ___, 116 S. Ct. 501, 133 L. Ed. 2d 472 (1995). We

22

examine the evidence in the light most favorable to the prosecution, making all reasonable inferences and credibility choices in favor of the verdict. *United States v. Vasquez*, 953 F.2d 176, 181 (5th Cir.), *cert. denied*, 504 U.S. 946, 112 S.Ct. 2288, 119 L. Ed. 2d 212 (1992). In 1992, the Fifth Circuit held that 18 U.S.C. § 924(c) merely requires evidence that the firearm was available to provide protection to the defendant in connection with his engagement in drug trafficking. *United States v. Ivy*, 973 F.2d 1184, 1189 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S.Ct. 1826, 123 L. Ed. 2d 455 (1993). However, the Supreme Court recently held that conviction for use of a firearm under § 924(c) requires evidence sufficient to show active employment of a firearm by a defendant. *Bailey v. United States*, ___ U.S. ___, 116 S. Ct. 501, 506, 133 L. Ed. 2d 472 (1995).

a. Count 3

Wesley James Wilson and Edd C. Douglas were convicted under Count 3 in connection with the seizure of a gun from a vehicle in a mall parking lot. According to one of the officers' testimony, Wilson, Edd C. Douglas, Darion Mosley, and Charles Harris were arrested in a reverse sting conducted by undercover officers. Harris and Mosley were in a brown truck with a man named Rolando; Harris was driving. Wilson was driving a brown Camaro and Edd C. Douglas was driving a blue truck. When officers moved in, Wilson attempted to flee in the Camaro. He was stopped before he could exit the parking lot. The officer making the arrest saw a gun in plain view as he pulled Wilson from his car. The gun was on the

23

floorboard on the driver's side of the Camaro.  In addition, Harris testified that Mosley told him that Wilson had the gun.  We find no evidence in the record that Edd C. Douglas, who was in a different vehicle, actually knew that Wilson had the gun.  The Government argued at trial that Wilson and Douglas both possessed the weapon on the floorboard of Wilson's vehicle and therefore "used" the weapon within the meaning of 924(c).

Section 924(c) requires the imposition of criminal penalties if the defendant, "during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm."  The Supreme Court in *Bailey* noted that "[h]ad Congress intended possession alone to trigger liability under § 924(c)(1), it easily could have so provided.  This obvious conclusion is supported by the frequent use of the term "possess" in gun-crime statutes to describe prohibited gun-related conduct." *Id.* at 506.  The Supreme Court also rejected the suggestion that "use" encompassed the scenario where an offender conceals a gun nearby to be at the ready for an imminent confrontation.  *Id.* at 508.  Congress knew how to draft a statute to reach a firearm that was intended to be used, see *e.g.*, § 924(d)(1), but did not employ that language in § 924(c) either.  *Bailey* concluded that the Government must show something beyond mere possession, to establish "use" for the purposes of the statute." *Id.* at 506.

Based on the proof offered in this case, we find the evidence insufficient to sustain the jury's verdict that Wilson and Edd C. Douglas used the firearm during and in relation to a drug

24

trafficking crime.

The indictment charged Wilson and Edd C. Douglas with using and carrying the weapon. It follows that we should determine what the Government must show, beyond mere possession, to establish "carrying" for the purposes of the statute.

We must start with the "ordinary or natural" meaning of the word carry. *Id.* Webster's Third New International Dictionary 343 (1981) defines carry as "to move while supporting (as in a vehicle or in one's hands or arms): move an appreciable distance without dragging: sustain as a burden or load and bring along to another place." The Supreme Court hypothesized as an example in *Bailey* that an offender who keeps a gun hidden in his clothing throughout a drug transaction has violated the "carrying" portion of § 924(c). *Bailey* at 507. In placing a gun under the driver's seat of a car, then driving the car to another location, one has carried the gun according to Webster's definition. This, in our view, satisfies § 924(c)'s carrying requirement. *See United States v. Riascos-Suarez*, 73 F.3d 616, 623 (6th Cir. 1996)(When a defendant is transporting a firearm in his vehicle in connection with a drug offense and when that firearm is within his reach, the evidence is sufficient to support the "carrying" requirement under § 924(c)). In this case, Wilson was driving the car with the gun within reach, to attend and later flee from an aborted drug transaction. Further, Edd C. Douglas could be held responsible for the acts that Wilson, a member of the conspiracy, took in pursuance of their unlawful scheme. *Pinkerton v. United States*, 328 U.S. 640, 6 S.

Ct. 1180 (1946).

In sum, we find the evidence insufficient to support a jury finding of "use," but sufficient to support a jury finding of carrying. However, because the jury may have rendered a guilty verdict on this count because of the liberal, pre-*Bailey* instructions on what constituted "use" of a firearm, we must reverse and remand the case. The government may retry Count 3 on the "carrying" theory only.

b. Count 6

The government concedes that the convictions under Count 6 against Edd C. Douglas and Cynthia Tamplin must be reversed and their sentences vacated. We agree and remand these Appellants' cases for resentencing on the remaining counts of conviction.

c. Count 12

An undercover officer testified that, after he purchased crack from defendant Altonio Douglas and another man, the two displayed firearms as they drove away to obtain more crack to sell to him. This leads us to conclude that the evidence was sufficient to show that Altonio Douglas "carried" a firearm. We nevertheless vacate the conviction because it may have been predicated on the pre-*Bailey* instruction on "use" of a firearm. Again, the government has the option of retrying Count 12.

d. Count 17

The government concedes that Eddie Franklin Douglas' § 924(c) conviction based on discovery of weapons in his home should be vacated. In view of Douglas' sentence of life imprisonment without

26

parole, there is no need to remand his case for resentencing.

ADMISSION OF PAPERS FOUND DURING SEARCH

The trial court admitted into evidence, over Appellants' objections, exhibits consisting of scraps of paper, envelopes, business cards, notebook pages, and a paper sack, each containing names, numbers, dollar amounts, and dates which the Government contended were records of drug transactions. The exhibits were seized in searches of various residences and the She Ice Disco. Appellants contend on appeal, as they did below, that the exhibits were hearsay and deprived Appellants of their Sixth Amendment confrontation rights. The trial court held that some of the exhibits were not hearsay, and that others were hearsay but were admissible under FED. R. EVID. 801(d)(2)(E) as coconspirator statements in furtherance of a conspiracy. We review trial court's admissions of evidence under the abuse of discretion standard. *United States v. Shaw*, 920 F.2d 1225, 1229 (5th Cir. 1991), *cert. denied*, 111 S. Ct. 2038 (1991).

Appellants argue that the writings were unauthenticated hearsay. The authentication requirement is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Such evidence can include circumstantial evidence, the document's own distinctive characteristics and the circumstances surrounding its discovery. *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993). A statement is admissible under FED. R. EVID. 801(d)(2)(E) when it is offered against a party and is a statement by a co-conspirator made during and in

27

furtherance of the conspiracy. *United States v. El-Zoubi*, 993 F.2d 442, 446 (5th Cir. 1993). The Government contends that the exhibits complained of met both of these requirements.

King particularly complains of the admission of a paper sack containing money with the word "Chocolate" on it. One of the codefendants testified that when he left proceeds of drug sales at Douglas' home, one of the conspirators would count the money and put his name on a sack. There was also testimony that "Chocolate" was King's alias. Another exhibit, M9, was identified through testimony as a record of a drug transaction kept by one of the women who kept records for Eddie Franklin Douglas. Admission of the "Chocolate" sack was not an abuse of discretion, as it met both the authentication and 801(d)(2)(E) requirements. Appellants' other complaints are not specific enough to identify the admission of any other exhibit that would amount to an abuse of discretion, and we have found none in the record.

### MOTION TO SUPPRESS HILL'S STATEMENT

Following a hearing, the district court denied Hill's motion to suppress a statement he made to officers after his arrest. At the hearing, the officers testified that Hill was advised of his *Miranda* rights orally and in writing, and the officers signed a form attesting to that fact. Later, prior to his statement, he was again advised of his rights, and this time he signed the form.

Hill claimed at the hearing that he was not advised of his rights and because the officers signed the form before he signed it, the procedure was tainted and therefore "outrageous," an

28

"attempt at subterfuge," and raises doubts as to the voluntariness of his statement. He further claims that his statement lacked voluntariness because of the circumstances surrounding the taking of his statement -- including the fact that he was 19 years old, he was arrested at his house at 7:00 a.m. when he had just awakened with a hangover, and he had no prior experience with law enforcement. Hill also claimed that he was taken to the FBI office and told that he would not be released until he gave a statement. In reviewing a trial court's ruling on a motion to suppress based on live testimony at a suppression hearing, the trial court's factual findings must be accepted unless clearly erroneous. *United States v. Maldonado*, 735 F. 2d 809, 814 (5th Cir. 1984). Given the conflicting testimony, the court's credibility determinations and fact findings are not clearly erroneous.

## CONCLUSION

Based on the foregoing, we AFFIRM all of Appellants' convictions and sentences with the exception of the convictions under § 924(c) of Eddie Franklin Douglas, Cynthia Tamplin, Altonio O'Shea Douglas, Wesley James Wilson and Edd C. Douglas, which we REVERSE. Counts 3 and 12 are remanded for new trial. The sentences imposed on Edd C. Douglas and Cynthia Tamplin are vacated, and remanded for resentencing on the remaining counts of conviction. Further, we VACATE Arthur Franklin Douglas's sentence and REMAND his case for resentencing.

AFFIRMED in part, REVERSED in part, VACATED and REMANDED in part.

29

LUCIUS D. BUNTON, III, District Judge, dissenting:

I must respectfully dissent from the majority's conclusion that Eddie Franklin Douglas was not "in custody" when he made statements regarding the presence of firearms in his residence during the January 28, 1992, search. The Fifth Amendment provides an accused the right against compulsory self-incrimination. Miranda warnings are the prophylactic "measures to insure that the right against compulsory self-incrimination is protected." U.S. v. Smith, 7 F.3d 1164, 1170 (5th Cir. 1993) (quoting Duckworth v. Eagan, 492 U.S. 195, 203 (1989)). Although there is no precise admonition that must be given a criminal defendant, our system of criminal justice requires that an accused be given Miranda warnings, or their functional equivalent before any custodial interrogation.[5] A custodial interrogation results when a person is formally arrested or has a significant restraint imposed on his or her freedom of movement. California v. Beheler, 463 U.S. 1121, 1125 (1983)(per curiam). Douglas had not been formally arrested at the time he made the incriminating statements. Thus, the focus of the inquiry is whether the officers that executed the search warrant created an environment where Douglas' perception of his freedom of movement was restrained to the degree associated with a formal arrest.

When determining whether the restraint on an individual's movement rises to the level associated with a formal arrest, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). This reasonable person is one that is "neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." United States v. Bengivenga, 845 F.2d 593, 596 (5th Cir. 1988)(en banc). The awareness that the officers have probable cause to arrest or realizing that one has become the "focal point" of an investigation is relevant to the custody analysis when such awareness would lead a reasonable person to conclude that he was not free to leave. Id.

_____

Miranda warnings are not rights, in and of themselves, protected by the Constitution. However, the utter failure to notify an accused of his rights enunciated in Miranda may lead to a violation of a right protected by the Constitution (e.g., compulsory self-incrimination).

30

at 597 n.16.

Several other factors are appropriate to consider when applying the "reasonable person test." First, the length of the detention is relevant for determining whether a reasonable person would believe that his freedom is restrained to the degree associated with a formal arrest. Bengivenga, 845 F.2d at 598. A stop that is temporary and brief, such as a traffic stop, would not induce the reasonable person to the believe that he or she would be subjected to a significant restraint of his or her freedom of movement.

Second, the location of the detention and interrogation is pertinent. Id. Whether the questioning occurs in a public rather than private place mitigates the fear that a reasonable person may have of police overbearance or abuse. See id. The fact that the detention occurs under the scrutiny of other citizens reduces the individual's perception of the degree of restraint. Also relevant to this inquiry is the police presence --or the number of officers involved. One or two police officers' presence reduces a person's sense of vulnerability whereas a greater number increases a person's apprehension. See id. (citing Berkemer, 468 U.S. at 438).

And finally, the totality of the circumstances surrounding the detention and interrogation which tend to add or subtract from the subjective fear or surprise that a reasonable person would experience is pertinent. See id. at 599. I recognize that for the safety of both the agents, occupants and to prevent the destruction of evidence, surprise is an essential element in executing a search warrant of this kind. However, the manner in which this search warrant was executed served to increase the surprise and perceived threat of police overbearance and abuse. This impacts on the apprehension a reasonable person would feel during questioning by Federal Agents and whether or not that person would believe that he or she was free to leave.

Applying these factors to the case at bar, I believe that Eddie Franklin Douglas was "in custody" at the time he made the statements concerning the existence of firearms in the house, and that it was clearly erroneous for the trial court to deny Douglas' Motion to Suppress.

## I. Probable Cause to Arrest or Knowledge that Individual is Focal Point of Investigation

31

At the time Douglas responded to the officer's questions about the firearms, Douglas knew that he was an ex-felon and that he had guns in the house. Hence, when Special Agent David McIntosh told Douglas that he would be arrested if he was a felon and had weapons in the house, Douglas knew that he was not free to leave. See ROA Vol. 36 at 43, 48. A reasonable person, knowing that the police have ample cause to arrest him and that he is the "focal point" of the investigation would not feel free to leave. This was Douglas' situation. Furthermore, the fact that the agents knew that Douglas was a felon combined with Douglas' statement that there were weapons in the house raises the inference that the officers treated Douglas as they would treat a person that they had probable cause to arrest (i.e., the agents would not have allowed the individual to leave).[6]

## II. Length of Detention

The search warrant was executed at 7:30 a.m. Douglas was eventually arrested and first Mirandized between 3 and 4 p.m. when the United States Attorney made the decision to detain Douglas. ROA Vol. 36 at 68. The Government argues that Douglas was not in custody during this time. However, several Special Agents testified that it is the F.B.I.'s policy and practice to detain an individual until the United States Attorney makes the decision to permanently detain a person if he

---

The F.B.I.'s affidavit for search warrant states "EDDIE FRANKLIN DOUGLAS has felony narcotics convictions in 1973 and 1979. He is on Texas state parole for Life [sic]." Tr. at 622. Aff. of G. Maberry at 14. Similarly, Special Agent L. Steve Powell testified that before the Special Weapons and Tactics Team executed the search warrant, agents "had been informed that Mr. Eddie Douglas would be in that residence and that, previously, he had been convicted of an assault and an attempt to kill a police officer." ROA Vol. 36 at 9-10. Powell further stated that "we were also aware of the fact that more recently he had been arrested for being an ex-felon in possession of a firearm." Id. at 10.

Special Agent Carlos Ortiz also testified that he was aware that Douglas was a convicted felon before he entered the residence at the time of the search. Id. at 35.

Special Agent David McIntosh testified that he knew Douglas had a felony record when he told Douglas that he would be arrested if he had a record or if you "got [sic] an illegal weapon." Id. at 48-50. In fact, McIntosh stated that every agent participating in the search had been advised that Douglas was a convicted felon. Id. at 49.

One of the interrogating officers even testified that he understood that asking Douglas questions about his relationship or control over the premises were questions that could be incriminating. Id. at 60. Although aware of the incriminating nature that Douglas' answers could possess, the agent still did not Mirandize Douglas. Id. at 76.

has a felony conviction and is found in possession of a firearm.[7]

During the search, a Mansfield, Texas police officer was assigned to stay with Douglas and the family members. ROA Vol. 36 at 76. When Douglas needed to go to the bathroom later in the day, he was escorted into the residence by two officers. Id. Likewise, when Douglas asked if he was free to leave, Agent McIntosh related to Douglas that he preferred that he remain. Id. at 53. Given this mass of evidence, I conclude that Douglas' length of detention lasted from 7:30 a.m. to the time of his arrest between 3 and 4 p.m.

### III. Location of Detention

The search and subsequent detention was not carried out under the scrutiny of other citizens. During the suppression hearing, testimony indicated that the Agents blocked the entrances and exits to the neighborhood where the residence was located. Id. at 78. Law enforcement personnel were the only ones that witnessed the treatment afforded to Douglas. Furthermore, between twenty and fifty agents clothed in black body armor, masks, helmets, combat boots and armed with semi-automatic rifles and handguns executed the search warrant and remained at the residence during a portion of the search after the residence was secured. Needless to say, the police presence was significantly greater than that associated with a routine traffic stop and was not witnessed by other citizens as are brief stops at fixed border checkpoints. In fact, the only persons that were around Douglas during the majority of the search were Federal Law Enforcement Agents. The number of officers which were present during the period numbered between twenty and fifty. This police presence was significant and served to increase Douglas' perception of restraint on his freedom of movement.

Similarly, the interrogation at issue occurred at Douglas' residence was not in the nature of

---

Special Agent Ortiz testified that he would have maintained control over Douglas until the United States Attorney made the decision to arrest him because Ortiz knew that Douglas was a convicted felon, and he also knew that firearms had been found in the residence. See ROA Vol. 36 at 39.

Special Agent Mike Morgan testified that it is the F.B.I.'s normal procedure to detain a person who they believe to be a convicted felon and in possession of a firearm until the United States Attorney determines what action to take. See ROA Vol. 36 at 68.

a brief investigatory visit as when an officer drops by to inquire into a neighbor's complaint. Hence, the fact that the interrogation occurred in Douglas' residence is of little consequence in mitigating his fear of police overbearance or abuse.

### IV. Other Factors Creating a Subjective Fear

Likewise, a reasonable person, after witnessing federal agents dressed in tactical gear, crashing through the electronic gate across the driveway, attempting to rip the burglar bars off the residence with a tactical vehicle and exploding concussion devices in the yard would have felt that the restraint on his freedom of movement was to the degree that is associated with a formal arrest.

When Douglas was initially brought out of the house, he was unclothed from the waist down. The agents forced him onto the driveway facedown and kept him there at gunpoint for several minutes. The agents did not cover Douglas' naked body, nor allow him to have clothing for a period of time which was significant under the circumstances. Being unclothed, face down on the driveway and held at gunpoint in front of both male and female federal agents would certainly increase a reasonable person's subjective fear and is a degree of restraint associated with a formal arrest.

In light of the specific facts surrounding the execution of this search warrant, I believe that the trial court erred in failing to suppress Douglas' statements centering on the existence of weapons in his residence. Because the agents' custodial interrogation of Defendant violated his Fifth Amendment right against self-incrimination, and some of the guns were the fruit of the poisonous tree, I would also suppress the guns that were found as the result of Douglas's statements and vacate Douglas' conviction on Count 18 (Felon in Possession of a Firearm). I dissent with my colleagues on this issue, but concur with the remainder of the majority's opinion.

## APPENDIX A -- 93-1797

| NAME | COUNTS OF CONVICTION | SENTENCE |
|------|---------------------|----------|
| Eddie Franklin Douglas | 1. Conspiracy<br>17. Firearm during drug offense<br>18. Felon in possession of firearm | Life w/out parole<br>Life - concurrent<br>5 years - consecutive |
| Mary Jane Fike | 1. Conspiracy | 1 2 1 m o n t h s |
| Cynthia Tamplin<br>(aka She Ice) | 1. Conspiracy<br>5. Possess controlled substance<br><br>6. Firearm during drug offense<br>19. Maintaining place to manufacture<br>and distribute a controlled substance<br>20. Felon in possession of a firearm | 324 months<br>5 years consecutive |
| Altonio O'Shea Douglas<br>(aka Tony) | 1. Conspiracy<br>11. Possess controlled substance<br>12. Firearm during drug offense | life<br>5 years consecutive |
| James Weldon Campbell | 1. Conspiracy | 3 6 0 m o n t h s |
| Arthur Jackson Douglas | 1. Conspiracy<br>7. Specific sale | 168 months |
| Orpheus Hill<br>(aka "O") | 1. Conspiracy | 240 months |

| | | |
|---|---|---|
| Burvon King (aka Chocolate) | 1. Conspiracy | life |

| NAME | COUNTS OF CONVICTION | S E N T E N C E |
|---|---|---|
| Chauncey Mosley | 1. Conspiracy | 3 6 0    m o n t h s |
| Wesley James Wilson (aka Wes) | 1. Conspiracy <br> 2. Possess controlled substance <br> 3. Firearm during drug offense <br> 4. Money laundering | life <br> 5 years, c o n s e c u t i v e |
| Elbert Douglas, Jr. (aka Jr.) | 1. Conspiracy | life |
| Edd C. Douglas (aka E.C.) | 1. Conspiracy <br> 2. Possess controlled substance <br> 3 & 6. Firearm during drug offense <br> 4. Money laundering <br> 5. Possess cocaine <br> 8. Possess cocaine <br> 19. Maintain a place to manufacture and distribute a controlled sub. <br> 20. Felon in possession of a firearm | l i f e ,    p l u s <br> 25 consecutive years |