932 F.2d 1085
 UNITED STATES of America, Plaintiff-Appellee,
v.
Winston Gary THOMAS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bryon SAMUELS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Roy PLUMMER, a/k/a Gifford Plummer, a/k/a "Bully,"
Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Anez Sutherland ROBINSON, a/k/a "Dave," Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mark Anthony PULLOCK, Defendant-Appellant.
 Nos. 90-1530, 90-1546, 90-1555, 90-1545 and 90-1554.
 United States Court of Appeals,
Fifth Circuit.
 May 23, 1991.
Rehearing Denied in No. 90-1530
July 11, 1991.
 
 Elizabeth Unger Carlyle, Randal Mathis, Dallas, Tex. (court-appointed), for defendant-appellant in 90-1530.
 Delonia Watson, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.
 Robert Udashen, Dallas, Tex. (court-appointed), for defendant-appellant in 90-1546.
 Ronald L. Goranson, James D. McCarthy, Dallas, Tex. (court-appointed), for defendant-appellant in 90-1555.
 Randy Adler, Dallas, Tex., for defendant-appellant in 90-1545.
 John H. Martin, Dallas, Tex. (court-appointed), for defendant-appellant in 90-1554.
 Appeals from the United States District Court for the Northern District of Texas.
 Before GOLDBERG, SMITH, and BARKSDALE, Circuit Judges.
 JERRY E. SMITH, Circuit Judge:
 
 
 1
 Defendants, members of a cocaine importation ring, challenge the calculation of their sentences under the guidelines and contend that a recent Supreme Court case sharply curtails the discretion of a sentencing court to consider information contained in dismissed counts. Finding no error, we affirm.
 
 I.
 
 2
 Between April 1988 and December 1989, the defendants imported cocaine into the Dallas area for distribution through their crack houses. One member of the ring, Peter Lloyd Atkinson, admitted that between October 1 and December 20, 1989, the conspiracy distributed approximately six kilograms of crack cocaine per week, a total of approximately sixty-six kilograms. Atkinson also admitted that he and Prince Anthony Edwards distributed at least two kilograms of crack cocaine from New York to Dallas on two separate occasions and that he and several other non-indicted co-conspirators distributed about twelve kilograms of cocaine during 1989 from a separate, affiliated organization.
 
 
 3
 Roy Plummer originally was the manager of the distribution organization, responsible for picking up the crack cocaine and any money collected. He also prepared the payroll for the workers, with the remaining profits going to the leadership. Five to eight kilograms were sold each week in the houses directly supervised and operated by Plummer. Plummer also was involved in delivering between one and two kilograms of crack cocaine a week from the stash house, for what the PSI called a conservative total of eleven kilograms.
 
 
 4
 Byron Samuels was a worker who packaged crack for the original conspiracy. In 1988 he, along with a few cohorts, began to operate his own crack house. In 1989 Samuels and his uncle formed a new organization to sell crack on their own.
 
 
 5
 Winston Thomas allegedly began his career as a runner. In 1988, Thomas was arrested for the knowing possession, with intent to distribute, of 224 capsules (26.4 grams) of 93% pure cocaine base. After posting bond, he returned to New York to continue his work for Rafael Phillips, where he allegedly would pick up kilogram packs of cocaine, package it, and then give the crack to couriers for distribution for Edwards.
 
 
 6
 Anez Robinson admits that he knew Atkinson, Edwards, Plummer, and Mark Pullock and that he was involved in the distribution of cocaine base. Robinson rented or owned several residences used to prepare drugs for distribution and to store cash proceeds. Robinson also was the registered co-owner of an apartment complex where one of the crack houses was located. According to the PSI Robinson, along with Plummer, delivered crack twice a day to a storage house. Robinson also was a partner with two unindicted crack distributors who sold one to two kilograms of crack a week.
 
 
 7
 When the earlier partnerships dissolved, Robinson began to buy cocaine on his own. Police officers arrested Robinson when he attempted to purchase one kilogram of cocaine from them for $19,000. In an earlier meeting with an undercover officer, Robinson had agreed to purchase two kilograms of cocaine for $40,000.
 
 
 8
 Finally, Pullock was charged with conspiracy to distribute cocaine base, two counts of aiding and abetting travel in commerce to distribute cocaine base, and five counts of aiding and abetting deliveries of cocaine base. Pullock pleaded guilty to one count of aiding and abetting the delivery of cocaine base.
 
 
 9
 The presentence investigation report (PSI) for Pullock indicates that he was part of a conspiracy that included Edwards and Phillips, among others. Pullock contests this, stating that he conducted business in a smaller conspiracy involving only Walker and Samuels. Pullock thus disputes as clearly erroneous the district court's decision to charge him with conduct related to the entire conspiracy.
 
 
 10
 According to the investigating agents, all codefendants, with the exception of Polk, were in leadership or managerial positions at one time or another. In exchange for partial dismissals, the defendants pleaded guilty to various counts. The district court calculated their offense levels and assessed jail time to each of them. We deal with their appeals seriatim.
 
 II.
 A.
 
 11
 Our traditional rule concerning the proper calculation of drug quantities is that "in drug distribution cases quantities of drugs not specified in the count of conviction are to be included in determining the base offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." United States v. Byrd, 898 F.2d 450, 452 (5th Cir.1990) (per curiam); accord United States v. Taplette, 872 F.2d 101, 106 (5th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 128, 107 L.Ed.2d 88 (1989). At issue today is whether a recent Supreme Court decision curtails a sentencing court's discretion under the guidelines. We review this legal determination de novo.
 
 
 12
 In Hughey v. United States, --- U.S. ----, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990), the Court confronted the Victim and Witness Protection Act of 1982 (VWPA). The Court held that the VWPA authorized a sentencing court to award restitution to a victim only for the specific conduct that was the basis of the offense of conviction. A sentencing court therefore cannot consider losses occasioned by conduct related to dismissed counts or uncharged conduct. Id. 110 S.Ct. at 1985.
 
 
 13
 Samuels and Plummer contend that wherever Congress used the phrase "commission of an offense," whether in the VWPA or the Sentencing Reform Act, it intended that it be used just as the Court has interpreted it in the VWPA. Because the Sentencing Commission has interpreted the language more broadly, the defendants contend that it has gone beyond the scope of its authority.
 
 
 14
 At issue is the definition of relevant conduct that appears in U.S.S.G. Sec. 1B1.3:
 
 
 15
 1B1.3. Relevant Conduct (Factors that Determine the Guideline Range)
 
 
 16
 (a) Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
 
 
 17
 (1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense;
 
 
 18
 (2) solely with respect to offenses of a character for which Sec. 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction. [Emphasis added.]
 
 
 19
 We have interpreted this provision very broadly, as have other circuits, so as to preserve the traditional discretion of a sentencing court.[1]
 
 
 20
 Samuels and Plummer contend that the proper scope of the guidelines is no greater than that found in the VWPA wherever Congress used the phrases interpreted in Hughey. We reject this contention, however. Although we normally impart the same meaning to the same phrase throughout related statutes, see Sorenson v. Secretary of the Treasury, 475 U.S. 851, 860, 106 S.Ct. 1600, 1606, 89 L.Ed.2d 855 (1986), this argument is weakened considerably by the lineage of the statutes in question.
 
 
 21
 The VWPA was passed long before the Sentencing Reform Act and was reenacted as part of a recodification and overhaul of federal criminal law. We usually accord a similar meaning to similar language throughout a bill because it was drafted by one writer who presumably had a single meaning in mind. No such situation obtains here.
 
 
 22
 That the Sentencing Reform Act and the VWPA must be considered separately is reinforced by the language of Hughey. There the Court considered the VWPA in light of its own statutory language and goals--language and goals not present in the sentencing context. The Court's holding cannot be divorced from this language:
 
 
 23
 Given that the ordinary meaning of 'restitution' is restoring someone to a position he occupied before a particular event, ... the repeated focus in Sec. 3579 on the offense of which the defendant was convicted suggests strongly that restitution as authorized by the statute is intended to compensate victims only for losses caused by the conduct underlying the offense of conviction.
 
 
 24
 110 S.Ct. at 1982 (emphasis added, citations omitted). No such considerations present themselves to a court in the ordinary context of sentencing.
 
 
 25
 Furthermore, section 994(c)(2) of Title 28 provides that the Commission must take into account "the circumstances under which the offense was committed which mitigates or aggravates the seriousness of the offense." Comparing this mandate to the actual language of section 1B1.3 shows the similarity: Under the guidelines, the district court should consider
 
 
 26
 all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense.
 
 
 27
 We do not find the differences between the two to be any more than superficial. This conclusion only is strengthened by considering that section 994(d)(10) provides that the Commission was supposed to consider criminal history when it formulated its guidelines.
 
 
 28
 Finally, the defendants ignore the most important difference between the VWPA and the Reform Act. When the Hughey court evaluated the VWPA, it confronted a statute that extended to judges a power that they never before had possessed: the ability to assess restitutionary fines to compensate victims and their families. In the sentencing realm, however, Congress acted against a backdrop of hundreds of years of sentencing. We do not construe Congressional language to change long-standing practices unless the change manifests itself within the plain language of the statute.
 
 
 29
 No such manifestations are present here. Congress made open-ended its list of factors for the Commission to consider. Section 994(c) thus provides that the Commission "shall consider whether the following matters, among others, have any relevance." (Emphasis added.) Even if the plain language of the Sentencing Reform Act did not track the language of the guidelines, any reasonable deviation is justified by the non-exclusive nature of Congress's grant of authority to the Commission.
 
 
 30
 In short, sentencing is not like restitution. Sentencing boasts a long lineage, not present in the VWPA, that Congress had before it when it authorized the Commission. Congress had to overrule traditional sentencing authority with an obvious hand if it was to overrule it at all. We therefore hold that the district court did not err by considering crimes outside the count of conviction in the instant case.
 
 B.
 
 31
 When Congress enacted the Anti-Drug Abuse Act, it amended federal drug laws to make the penalty for distributing cocaine base substantially greater than the penalty for distribution of powdered cocaine. Compare 21 U.S.C. Sec. 841(b)(1)(A)(iii) with id. Sec. 841(b)(1)(A)(ii)(II). The guidelines adopt a similar sentencing scheme.
 
 
 32
 Samuels, Robinson, and Pullock assert that this dichotomy is unconstitutional. They first contend that cocaine base and cocaine are one and the same drug, thus meaning that Congress has enacted two different sentences for the same crime. They also argue that even if the two drugs are different, the failure of the statute to define the differences makes the statute unconstitutionally vague.
 
 
 33
 Neither of the defendants' arguments is persuasive. Cocaine base is a different drug from cocaine, see United States v. Metcalf, 898 F.2d 43, 46 (5th Cir.1990); United States v. Van Hawkins, 899 F.2d 852, 854 (9th Cir.1990), and, because it is prepared for inhalation, concentrates and magnifies the effect of one gram of cocaine to such a degree that dealers profitably can sell it in very cheap yet still-potent quantities. Treating the two substances differently thus is not a due process violation, as when cocaine is changed into cocaine base, it becomes a different chemical substance. Congress need not treat dissimilar drugs similarly.
 
 
 34
 We also reject the contention that the statute is unconstitutionally infirm because it does not define the term "cocaine base." While it is true that a defendant must be notified of the potential penalties of his actions so that he may steer clear of illegal conduct, and so that defendants who commit the same crime will not suffer from arbitrary and discriminatory enforcement, "[w]here a defendant embarks on a patently unlawful course of conduct, due process does not require that a statute demark the limits of his offense with algebraic exactitude." United States v. Abod, 770 F.2d 1293, 1297 (5th Cir.1985).
 
 
 35
 A criminal statute only need be sufficiently definite to "guide the judge in its application and the lawyer in defending one charged with its violation." Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952). Unfortunately, even many children on the street know the difference between powdered cocaine and crack. It is "[a] fundamental canon of statutory construction ... that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). Because we can fall back on the common usage and definition of crack cocaine, we follow the lead of the courts that already have rejected this vagueness argument.[2] Thus, because both the statute and its mirror-image guideline sections have a reasonable basis and are not vague under commonly understood usages, the statutory scheme is not void for vagueness.
 
 III.
 A.
 
 36
 Thomas contends that he was not given sufficient notice of the relevant conduct for which he would be accountable, as the description of some of his conspiracy activity appeared in the factual portion of his PSI rather than in the section entitled "relevant conduct." He bases his argument upon United States v. Otero, 868 F.2d 1412, 1415 (5th Cir.1989), in which we held that "[i]f ... the court intends to rely on [an] additional factor to make an upward adjustment of the sentence, defense counsel must be given an opportunity to address the court on the issue."
 
 
 37
 Thomas attempts to leverage this language into the general proposition that not only must the PSI give him notice of what relevant conduct will be used against him, but only the conduct mentioned in the specific section on "relevant conduct" will count. The better interpretation, however, is that it is the PSI, taken as a whole, that matters for determining whether he had adequate notice.
 
 
 38
 This premise is supported by Otero. What Thomas ignores is that in Otero we remanded on only some of the asserted erroneous grounds. Otero also contested the court's factual conclusion that he possessed a weapon during the commission of the offense. We upheld this determination on appeal:
 
 
 39
 The record does not reflect that Otero possessed a firearm when the cocaine was delivered. The addendum to the presentence report, however, concludes that Otero transported the cocaine from Houston to San Antonio and that he had the firearm in his possession during the trip.... Thus the court's factual conclusion that Otero constructively possessed a weapon during the commission of the offense is not clearly erroneous.
 
 
 40
 Id. (emphasis added).
 
 
 41
 Thus the very case Thomas cites as granting him the right to notice also establishes that the notice need not appear in the relevant conduct section--or even in the main body of the PSI. In fact, we stated in Otero that "the court may base its sentencing decisions on matters not raised in the presentence report." Id. If it is permissible for a sentencing court to consider matters not even mentioned in the PSI, it certainly is proper for the court to consider relevant conduct detailed in the factual portion of a defendant's PSI. The district court therefore did not err by considering all the transactions mentioned in Thomas's PSI.
 
 B.
 
 42
 Thomas also contests the district court's calculation of his offense level because the court considered quantities of drugs that were outside the offense of conviction. We will affirm the district court if a preponderance of the evidence supports the finding. United States v. Casto, 889 F.2d 562, 569 (5th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1164, 107 L.Ed.2d 1067 (1990). We review this finding under a clearly-erroneous standard. United States v. Mejia-Orosco, 867 F.2d 216, 221 (5th Cir.), cert. denied, 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989).
 
 
 43
 We already have decided that "[t]he guidelines make clear that in drug distribution cases quantities of drugs not specified in the count of conviction are to be included in determining the base offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." Byrd, 898 F.2d at 452; accord Taplette, 872 F.2d at 106. In this case, a co-conspirator established that Thomas and his cohorts trafficked up to sixty-six kilograms of cocaine, well above the threshold the court needed to support its sentence. This was rewrable evidence that the court could consider, as the court is not limited to the amounts actually seized.[3] The court also had before it the testimony of a special agent who concluded that Thomas had returned to New York, where he picked up couriers carrying kilogram sacks of cocaine, testimony that independently supports the court's finding.[4] The court therefore did not err by adopting the findings of the PSI.
 
 C.
 
 44
 Thomas asserts that he deserves lenient treatment for his minor participation in the conspiracy. The application notes define a minor participant as "any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. Sec. 3B1.2, comment 3; see United States v. Rivera, 898 F.2d 442, 446 (5th Cir.1990). We review section 3B1.2 determinations under a clearly-erroneous standard. Thomas, 870 F.2d at 177.
 
 
 45
 In this case, the PSI shows that Thomas was only a go-between, and not a supervisor, and that he would pick up cocaine, package it, and give it to the couriers. This was less than the supervisory and leadership roles that the other defendants assumed.
 
 
 46
 His role, however, was greater than the minimal participation exercised by the defendants to whom we previously have allowed a downward adjustment. In these cases, while the defendants may have been aware of the extent of the entire conspiracy, they did not take any real part in forwarding them. In contrast, the defendant in Giraldo-Lara, like Thomas,
 
 
 47
 admitted that she had been involved on a daily basis in acquiring, transporting, and distributing cocaine and money over a period of about two years. Thus, although she may have played only a minor role in the particular transaction that led to her arrest, the sentencing judge did not err in concluding that she was not a minor participant in the cocaine distribution ring.
 
 
 48
 919 F.2d at 22.
 
 
 49
 It is improper for a court to award a minor participation adjustment simply because a defendant does less than the other participants. Rather, the defendant must do enough less so that he at best was peripheral to the advancement of the illicit activity. Considering Thomas's daily role in the conspiracy, the district court did not err by finding that his participation, while less than the other defendants, was not minor.
 
 IV.
 A.
 
 50
 Robinson contends that the district court erred by awarding him a three-point upward adjustment for his supervisory role in the conspiracy. We review this contention under a clearly-erroneous standard of review. United States v. Pierce, 893 F.2d 669, 676 (5th Cir.1990).
 
 
 51
 The facts of this case show that Robinson was more than just another drug runner and that he was involved in both procuring and distributing drugs. Robinson simply is disputing the facts found by the trial court, which we cannot overturn as they are not clearly erroneous.
 
 
 52
 Robinson's arrangement of a place to store the proceeds and undistributed crack included not only renting apartments, but actually purchasing and using an apartment complex to house a crack joint. This is sufficient involvement, even ignoring Robinson's other activities, to support the inference that Robinson "exercised some degree of control over others involved in the commission of the offense or [was] responsible for organizing others for the purpose of carrying out the crime." United States v. Fuller, 897 F.2d 1217, 1220 (1st Cir.1990).
 
 B.
 
 53
 Finally, Pullock contends that under Rivera, 898 F.2d at 446, the district court erred by including the cocaine that was part of the larger conspiracy. In Rivera we vacated a sentence because the court erroneously had considered heroin attributable solely to codefendants, even though the defendant had no idea that his codefendants were selling heroin.
 
 
 54
 Pullock argues that he was involved in a small cocaine operation only tangentially involved with the major one, and that he did not know that the larger conspiracy was occurring. Pullock, though, cannot make the same claim of ignorance that the defendant made in Rivera. The government introduced credible evidence that the drug conspiracy involved Pullock from the very start and that he worked for Robinson, Atkinson, and Edwards. It was only later that Pullock left the group to start his own subsidiary distribution ring, which continued to get cocaine from members of the old conspiracy. Under these circumstances, the district court did not err by finding that Pullock was part of the larger cocaine distribution ring.
 
 
 55
 Furthermore, the government's evidence, which was not disputed, shows that a joint venture was ongoing, with Pullock as a member. The district court properly could adopt this finding without more inquiry, as it was unrebutted. Rodriguez, 897 F.2d at 1328. Thus, because Pullock was part of several groups, each of which was connected with the original large conspiracy, charging him with knowledge of the entire conspiracy and drug amounts was not error.
 
 V.
 
 56
 Hughey does not mandate that we curtail the traditional broad sentencing authority that sentencing courts exercise. Because the district court properly included all quantities of drugs firmly linked to the defendants, and because we find no other error, we AFFIRM.
 
 
 
 [1]
 We recently described the broad discretion the sentencing court enjoys under the guidelines:
 The district court can consider a broad range of conduct in assessing a defendant's offense level under the guidelines and is not limited solely to the conduct for which the defendant is being sentenced. United States v. Taplette, 872 F.2d 101, 106 (5th Cir.), cert. denied [--- U.S. ----] 110 S.Ct. 128 [107 L.Ed.2d 88] (1989). For example, the district court properly can rely upon ' "evidence underlying crimes for which the defendant has been indicted but not convicted," ' Roussell v. Jeane, 842 F.2d 1512, 1523 (5th Cir.1988) (quoting United States v. Ochoa, 659 F.2d 547, 549 (5th Cir. Unit A Oct.1981), cert. denied, 455 U.S. 959 [102 S.Ct. 1472, 71 L.Ed.2d 678] (1982)), or upon 'evidence underlying dismissed counts,' id. (citing United States v. Martinez, 584 F.2d 749, 750 (5th Cir.1978)).
 United States v. Edwards, 911 F.2d 1031, 1033 (5th Cir.1990).
 
 
 [2]
 See, e.g., Hawkins, 899 F.2d at 854; United States v. Reed, 897 F.2d 351, 352 (8th Cir.1990) (per curiam); United States v. Barnes, 890 F.2d 545, 552 (1st Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990); United States v. Cyrus, 890 F.2d 1245, 1248 (D.C.Cir.1989); United States v. Williams, 876 F.2d 1521, 1525 (11th Cir.1989); United States v. Brown, 859 F.2d 974, 976 (D.C.Cir.1988) (per curiam)
 
 
 [3]
 United States v. Thomas, 870 F.2d 174, 176 (5th Cir.1989). We confronted a similar situation in United States v. Giraldo-Lara, 919 F.2d 19 (5th Cir.1990), in which the defendants agreed to purchase seven kilograms from a drug dealer turned informant. As a group, however, the defendants were sentenced for conspiracy to distribute 20 kilograms of cocaine. We upheld the sentence
 
 
 [4]
 We also note that Thomas introduced no evidence that would rebut the findings of the PSI. A district court may adopt the findings of a PSI verbatim if there is no rebuttal evidence presented by the defendant. United States v. Rodriguez, 897 F.2d 1324, 1328 (5th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 158, 112 L.Ed.2d 124 (1990)