# United States Court of Appeals
## For the First Circuit

---

STATE OF NEW HAMPSHIRE,

Plaintiff, Appellant,

NEW HAMPSHIRE DEPARTMENT OF ADMINISTRATIVE SERVICES; STATE OF NEW
HAMPSHIRE DEPARTMENT OF TRANSPORTATION; NEW HAMPSHIRE STATE
TREASURER; STATE OF NEW HAMPSHIRE DEPARTMENT OF EDUCATION,

Plaintiffs,

v.

DAVID RAMSEY, JOHN LOVEDAY, JOHN TOOMEY, MELINDA CONRAD, WAYNE
ALDRICH, NORMAN JITRAS, MICHAEL ROSSI, JOHN SCARLOTTO, and
MARTHA YORK, as members of the N.H. Committee of Blind Vendors;
NEW HAMPSHIRE COMMITTEE OF BLIND VENDORS;
UNITED STATES DEPARTMENT OF EDUCATION,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

---

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

---

Nancy J. Smith, Senior Assistant Attorney General, with whom
Peter W. Heed, Attorney General, was on brief, for appellant.

Jack B. Middleton, with whom Andrea L. Daly, Laura B. Dodge,
and McLane, Graf, Raulerson & Middleton were on brief, for appellee

New Hampshire Committee of Blind Vendors.

Mark B. Stern, Attorney, Appellate Staff, Civil Division, with whom Alisa B. Klein, Attorney, Appellate Staff, Civil Division, Peter D. Keisler, Assistant Attorney General, and Thomas P. Colantuono, United States Attorney, were on brief, for appellee United States Department of Education.

Robert R. Humphreys on brief for Randolph-Sheppard Vendors of America, American Council of the Blind, and National Educational and Legal Defense Services for the Blind, amici curiae.

———————————

April 29, 2004

———————————

**V.**

We turn to the question whether the district court erred in affirming, in large part, the federal arbitration panel's award of prospective equitable relief.[21]

**A.    Challenges to the Arbitration Panel's Statutory Authority to Issue Prospective Equitable Relief**

In the administrative proceedings and before the district court, New Hampshire raised many arguments challenging the scope of the arbitration panel's statutory authority to issue prospective equitable relief, but it has abandoned most of those arguments in this appeal.[22]

The state does argue in this appeal, as part of its Eleventh Amendment analysis, that the arbitration panel lacked authority to

---

[21]    New Hampshire has not argued that the panel could do nothing more than declare rights of the private parties and the state, and so has waived the argument.

[22]    None of the following five arguments, all of which the state has urged at other stages in this case, are raised in the state's briefs on appeal: (1) that the arbitration panel has no remedial power whatsoever because the R-S Act authorizes only the head of the state agency to fashion remedies; (2) that, even if the arbitration panel had remedial power, that power does not extend to ordering the state to terminate existing contracts for vending before those contracts expire; (3) that the arbitration panel is not authorized under the R-S Act, which applies only to federal property, to issue relief as to state-owned rest areas; (4) that the arbitration panel cannot award any relief at all for violations of § 111(b) because there is no private right of action under § 111(b); and (5) that even if the arbitration panel could issue relief for violations of § 111(b), it cannot issue relief as to state-owned rest areas on toll roads built without federal funding, such as the Hooksett rest areas.  We do not reach any of these issues, which have been waived.

issue any relief at all because, as a matter of statutory construction, R-S grievance procedures do not apply to § 111(b) claims. To the extent this argument is a free-standing challenge to the arbitration panel's statutory authority to award prospective relief in this case, we reject it. The state is estopped from making the argument, given its earlier position in 1998 that the Blind Vendors' § 111(b) claims had to go through R-S grievance procedures.

But even if the state were not estopped, its argument is wrong on the merits. The R-S Act states that "[a]ny blind licensee who is dissatisfied with any action arising from the operation or administration of <u>the vending facility program</u>" may avail himself or herself of R-S grievance procedures. 20 U.S.C. § 107d-1(a) (emphasis added). The relevant language, again, of § 111(b) is:

> In permitting the placement of vending machines, the State shall give priority to vending machines which are operated through the State licensing agency designated pursuant to section 2(a)(5) of the Act of June 20, 1936, commonly known as the 'Randolph-Sheppard Act' (20 U.S.C. 107a(a)(5)).

The issue is whether the "vending machines" to which § 111(b) refers are within "the vending facility program" described in the R-S Act, 20 U.S.C. § 107d-1(a); if so, R-S grievance procedures apply to § 111(b) claims.

We answer in the affirmative, based on the plain language of the R-S Act and § 111(b). The R-S Act does not define "the vending

facility program."  Neither statute expressly states what the relationship is between the "vending machines" described in § 111(b) and "the vending facility program" created by the R-S Act. Nonetheless, the text of § 111(b) is clear that the vending machines to be given priority are those "which are operated through the State licensing agency designated pursuant to . . . the 'Randolph-Sheppard Act' . . . ."  Vending machines operated through SLAs are, by definition, part of the R-S vending program.  They are operated by blind vendors licensed under the R-S Act, see 20 U.S.C. § 107a(b) (licensees must be blind); id. § 107a(a)(5) (licensing provisions apply to the operation of vending facilities on state as well as federal property), to whom the SLA is required under the R-S Act to provide vending facility equipment and initial stock, see id. § 107b(2).[23]

Our plain-text reading makes sense from a functional perspective.  It is not surprising, for reasons of efficiency and consistency, that Congress would intend R-S grievance procedures to apply when a blind vendor complains that the state failed to

---

[23]   SLAs sometimes operate vending machines outside the R-S Act.  For example, in New Hampshire, the Bureau of Blind Services, in addition to serving as the designated SLA under the R-S Act, performs other functions in the state, such as conducting general vocational training for the blind.  See N.H. Rev. Stat. Ann. § 186-B:4.  Among those functions is the operation of vending machines on state property under the state's "mini"-R-S Act.  N.H. Rev. Stat. Ann. § 186-B:9-15.  But, to the extent that SLAs operate those machines, they do so in their general capacity as agencies of the state, not in their capacity as licensing agencies designated under the R-S Act.

provide the SLA priority, whether the vending machine be along the interstate system or elsewhere. If enforcement were not consolidated under one system, inconsistencies and unfairness might arise from splitting grievance procedures between the USDOE and the Federal Highway Administration.

The state cites, in support of a different argument, a March 13, 1984 Department of Transportation memorandum providing guidance on implementing § 111(b) (the "1984 DOT Guidelines"). This memorandum states, "The only application the [R-S Act] has to Section 111 is to establish the licensing agency in each State that is to be given priority. With the exception of rest areas on Federal lands, none of the [R-S Act] requirements apply to vending machines in Interstate rest areas." We read this statement, which does not have the force of a regulation, as being concerned with the additional substantive guarantees of the R-S Act: for example, the provisions concerning vending income, which do not apply to vending machines operated under § 111(b).[24] The 1984 DOT Guidelines never mention the issue of R-S grievance procedures. And the DOT

_____

[24] The R-S Act provides blind vendors an entitlement to a percentage of all income generated by competing vending machines operating on federal property whether or not blind vendors operate the machines. 20 U.S.C. § 107d-3. See Comm. of Blind Vendors v. District of Columbia, 28 F.3d 130, 131 (D.C. Cir. 1994). We agree with the state that there is no indication that Congress intended § 111(b) of the STA Act to incorporate such a provision or otherwise to impose such an obligation. This was also the view of the Comptroller General of the United States in a letter dated February 28, 1984 to Rep. Kennelly.

used identical language in a memorandum on October 5, 1992 that principally discusses the application of substantive requirements of the R-S Act to vending machines in rest areas along interstate highways. It is unlikely that the DOT intended to foreclose application of R-S grievance procedures despite the plain language of the R-S Act and § 111(b).

**B.    The Meaning of "Priority" in 23 U.S.C. § 111(b)**

The arbitration panel held that "'priority' requires that [state licensing agencies] be approached and be given a right of first refusal before any other entity be approached to operate these sites." This interpretation of "priority" in § 111(b) involves two requirements: a timing requirement and a requirement that the right of priority be waived in writing. First, the panel held that priority requires that the SLA "receive an opportunity to operate vending machines <u>before</u> any private vendor is even <u>pursued</u>" (emphasis original). Second, it held that "before [the state] approaches any other entity to operate machines at rest areas on the Interstate Highway System," the SLA "must waive its right to a priority in writing."

The state argues that the district court erred in upholding the arbitration panel's interpretation of "priority." Although the state does not differentiate between the two components of priority outlined by the administrative panel, the state seems to be challenging both. It argues that priority under § 111(b) requires

-48-

only that the state confer on the SLA "an advantage not granted to any other potential vendor," and that its policy of allowing vending machines at a rest area to be operated through the Bureau of Blind Services if and only if the Bureau matches the high bid meets that definition.

Our review of the legal meaning of priority in § 111(b) is de novo, subject to any applicable principles of deference. Griffiths v. INS, 243 F.3d 45, 49 (1st Cir. 2001).[25] Examining the two

---

[25] The parties dispute the level of deference, if any, owed here. The district court applied Chevron, U.S.A. v. Natural Res. Def. Council, 467 U.S. 837 (1984), which requires courts to accept, in certain circumstances, an agency's reasonable construction of an ambiguous statute. Id. at 843-44.

The state argues that the district court erred in applying Chevron deference. The state says, inter alia, that Chevron deference is appropriate only when Congress has delegated authority to the agency to implement the statute in question. See 1 Pierce, Administrative Law Treatise § 3.5 (2002) ("Chevron [deference] applies only when an agency adopts a construction of a statute it implements" because only then has "Congress explicitly or implicitly assigned to the agency the task of resolving all policy disputes that arise under the statute."); cf. Chevron, 467 U.S. at 844 ("[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer" (emphasis added)). Here, the state says, Congress never delegated authority to interpret the STA Act to the USDOE or its arbitration panels. Cf. 23 U.S.C. § 315 (delegating rulemaking power to carry out the STA Act to the Secretary of Transportation). The Blind Vendors respond that the state waived this argument in district court and that, in any event, Congress did delegate power to the federal arbitration panel to interpret § 111(b) because R-S grievance procedures apply to violations of § 111(b).

The Blind Vendors also argue that even if Chevron deference does not apply, the arbitration panel is still entitled to some deference under Skidmore v. Swift & Co., 323 U.S. 134 (1944), because of the Department of Education's expertise in administering blind vendor programs. See United States v. Mead Corp., 533 U.S. 218, 234 (2001) (applying Skidmore deference based on "'specialized experience and broader investigations and information' available to

-49-

components of the arbitration panel's interpretation of priority in turn, we affirm the district court in upholding the panel's interpretation. Although we recognize that there are potentially a number of other issues that could arise about operation of the priority system, we confine ourselves to a review of the district court's holding, as those other issues are not before us. We begin by looking to the plain language of the statute. <u>Greebel</u> v. <u>FTP Software, Inc.</u>, 194 F.3d 185, 192 (1st Cir. 1999).

### 1. The Timing Requirement

We turn first to the question whether "priority" under § 111(b) requires that the SLA be consulted before other vendors are considered.

The STA Act does not expressly define the term "priority," and the DOT, to which Congress has given rulemaking power to implement § 111(b), <u>see</u> 23 U.S.C. § 315, has not issued regulations or interpretive rules defining the term. The state and Blind Vendors both cite the same dictionary definition of priority:

> Precedence, going before. A legal preference or precedence. . . . When two persons have similar rights in respect of the same subject-matter, but one is entitled to exercise his right to the exclusion of the

_____

the agency"). The state responds that <u>Skidmore</u> deference is inappropriate because the arbitrators in this case were not members of the Department of Education. Nothing in the record indicates that the arbitrators here had any special expertise in this area.

We need not resolve this dispute over the appropriate level of deference because we affirm the district court's decision to uphold the arbitration panel's interpretation, regardless whether any deference applies.

-50-

other, he is said to have priority.

Black's Law Dictionary (6th ed. 1990).

The Blind Vendors argue that a priority involves "precedence" and thus requires that the Bureau of Blind Services be offered the contract before others. The state argues based on the same definition that a priority is simply a "preference" accorded to parties that otherwise have "similar rights" and thus requires only that the STA Act be given some unique advantage in the bidding process, such as the right to the contract if it matches the high bid. While the state's argument is plausible, we think that it is inconsistent with congressional intent.

Because the plain meaning is not entirely clear, we look to other sources. Greebel, 194 F.3d at 192. One source is a memorandum of guidelines issued by the DOT on March 11, 1983, shortly after the passage of § 111(b) (the "1983 DOT Guidelines"), which states:

> Documentation demonstrating a positive initiative to involve the designated Randolph-Sheppard Act State agency will be required before the State highway agency proposes alternative organizations or corporations to operate the vending machines. However, if the designated Randolph-Sheppard Act agency waives its rights in writing, the State highway agency is free to negotiate agreements . . . with any organization or corporation.

Under the 1983 DOT Guidelines, the state must attempt to negotiate an agreement with the SLA before considering other vendors. Although the 1983 DOT Guidelines are not entitled to Chevron

deference because they are not binding regulations, they have persuasive authority. See United States v. Mead Corp., 533 U.S. 218, 234-35 (2001) (applying Skidmore deference to interpretive rules). If Congress had disagreed with the 1983 DOT Guidelines, it could easily have amended § 111(b) at some point in the last twenty years to clarify its intent.

The 1983 DOT Guidelines are consistent with how Congress has viewed "priority" under the R-S Act. We note at the outset that we look to the priority provision of the R-S Act because of its similarity in language and purpose to § 111(b), not because we think that it is somehow incorporated in § 111(b). Although § 111(b) incorporates R-S grievance procedures because, as we have explained, the § 111(b) program is part of the "vending facility program" under 20 U.S.C. § 107d-1(a) of the R-S Act, there is no language in the STA Act or the R-S Act indicating that § 111(b) necessarily incorporates the R-S Act's "priority" provision, 20 U.S.C. § 107(b). Section 111(b)'s only reference to the R-S Act is to 20 U.S.C. § 107a, which is an entirely different section from that containing the priority provision.

Instead, our reason for looking to the R-S Act is that Congress uses the term "priority" in the R-S Act in a manner almost identical to its use of the term in § 111(b). Compare 23 U.S.C. § 111(b) ("In permitting the placement of vending machines, the state shall give priority to vending machines which are operated through

the State licensing agency designated pursuant to . . . the 'Randolph-Sheppard Act' . . . ."), with 20 U.S.C. § 107(b) ("In authorizing the operation of vending facilities on Federal property, priority shall be given to blind persons licensed by a State agency as provided in this chapter . . . ."). This parallel language was not accidental. Congress was clearly aware of the R-S Act in drafting § 111(b), given that § 111(b) directly references the R-S Act. Where Congress uses the same term in the same way in two statutes with closely related goals, basic canons of statutory construction suggest a presumption that Congress intended the term to have the same meaning in both contexts. See Sullivan v. Stroop, 496 U.S. 478, 484 (1990) (applying the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning" to a single term used in two separate, but related, statutes (internal quotation marks omitted)).

This presumption can be rebutted when there is some indication that the term is intended to serve different purposes in each statute, see Gen. Dynamics Land Sys., Inc. v. Cline, 124 S. Ct. 1236, 1245 (2004), but we see no basis for that conclusion here. The state relies on the 1984 DOT Guidelines, which state that "[t]he only application the [R-S Act] has to Section 111 is to establish the licensing agency in each State that is to be given priority." This statement, however, indicates only that the DOT

-53-

does not see § 111(b) as <u>incorporating</u> the substantive provisions of the R-S Act.  As we have said, our reliance on the use of the term "priority" in the R-S Act is not based on a belief that § 111(b) necessarily incorporates the priority provisions of the R-S Act.  The 1984 DOT Guidelines tell us nothing about the issue at hand: whether the priority provisions of the R-S Act and § 111(b) have different purposes.[26]

---

[26]   The state also presents several other arguments that the priority provisions of the R-S Act and § 111(b) serve different purposes.  First, the state argues that the R-S Act's use of the term is "specifically limited to the section describing the Secretary's authority to proscribe [sic] regulations regarding this subsection."  This contention is refuted by the plain language of § 107(b), in which Congress expressly created the priority requirement <u>in addition to</u> giving the Secretary rulemaking powers to enforce that requirement.

Second, the state urges us to infer from Congress's failure to expressly incorporate the priority provisions of the R-S Act into the STA Act that Congress intended the two priority provisions to have different purposes.  We see no basis for such an inference.  Courts regularly presume words in closely related statutes to have the same meaning where Congress has declined to expressly incorporate one statute's interpretation of the term into the other.  <u>See, e.g.</u>, <u>Vectra Fitness, Inc.</u> v. <u>TNWK Corp.</u>, 162 F.3d 1379, 1383 (Fed. Cir. 1998) ("[I]t cannot be presumed that the [same] term has two different meanings in these closely related statutes."); <u>United States</u> v. <u>Thomas</u>, 932 F.2d 1085, 1088 (5th Cir. 1991) ("[W]e normally impart the same meaning to the same phrase throughout related statutes . . . .").

Third, taking out of context language from <u>Sentinel Communications Co.</u> v. <u>Watts</u>, 936 F.2d 1189 (11th Cir. 1991), the state argues that § 111(b), unlike the R-S Act, is merely a delegating statute that "does not purport to authorize <u>any</u> type of scheme, discretionary or not, for the substantive regulation of vending machines at interstate rest areas" (emphasis in original).  Instead, the state suggests, § 111(b) leaves the task of defining the precise contours of priority entirely to the states.  We disagree.  Congress expressly created a federal priority requirement, and there is no indication that Congress intended to create state-by-state variations.  The state misreads <u>Sentinel</u>.

We turn to the use of "priority" in § 107(b) of the R-S Act. The R-S Act does not define "priority," and the Department of Education, which is authorized to promulgate regulations to implement the R-S Act, see 20 U.S.C. § 107(b), has not defined the term in its regulations. But the legislative history of the R-S Act is clear that Congress intended "priority" to signify more than a mere preference. Before 1974, the R-S Act provided a "preference" rather than a "priority" to blind vendors: "In authorizing the operation of vending stands on Federal property, preference shall be given, so far as feasible, to blind persons licensed by a State agency as provided in this chapter . . . ." 20 U.S.C. § 107 (1970) (repealed 1974). This changed in 1974, when Congress determined that "the program has not developed, and has not been sustained, in the manner and spirit in which the Congress intended." R-S Act Amendments of 1974, Pub. L. No. 93-516, § 201(1), 88 Stat. 1617, 1622 (1974). Congress found that "to [e]nsure the continued vitality and expansion of the Randolph-Sheppard program," it had to "establish a priority for vending facilities operated by blind vendors on Federal property." Id. § 201(3). To give effect to this amendment, "priority" must be

Sentinel held that § 111(b) does not directly impose obligations on the state in the sense that the state can choose not to participate in the program by not placing vending machines in interstate rest areas. 936 F.2d at 1196. Sentinel did not say that once a state does choose to participate, § 111(b)'s requirement of priority somehow imposes no obligations.

understood to mean something more than the state's definition of the term as a simple preference. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." Babbitt v. Sweet Home Chapter of Communities for a Great Or., 515 U.S. 687, 701 (1995) (quoting Stone v. INS, 514 U.S. 386, 397 (1995)).

More importantly, the legislative history shows that Congress specifically intended the "priority" requirement in the R-S Act to give blind vendors a prior right to negotiate, through their SLAs, the operation of vending facilities on federal property. The Senate Committee Report to the 1974 amendments explained:

> The insertion of the term 'priority' underscores the Committee's expectation that where a vending facility is established on Federal property, it is the obligation of the agency in control of such property, the Secretary of [Health, Education, and Welfare], and the State licensing agency to assure that one or more blind vendors have a prior right to do business on such property, and furthermore that, to the extent that a minority business enterprise or non-blind operated vending machine competes with or otherwise economically injures a blind vendor, every effort must be made to eliminate such competition or injury.

S. Rep. No. 93-937, at 15 (1974) (emphasis in original). Congress was aware of these 1974 amendments to the R-S Act when it enacted § 111(b) in 1983. We note that we see no basis to assume that, by conferring a prior right to negotiate, Congress intended to give SLAs the right to operate vending machines no matter how unreasonable, in light of congressional purposes, their bids may be.

2.    The Waiver Requirement

The next question is whether the arbitration panel was correct to interpret "priority" as requiring additionally that the state obtain a written waiver from the Bureau before approaching other vendors.  We answer that question in the affirmative, finding that a waiver requirement is the interpretation most consistent with Congress's likely intent.  This waiver requirement operates as a bargaining chip for the SLA; it does not guarantee a bid will be successful even if entirely unreasonable given congressional intent.  See 1983 DOT Guidelines, supra.

Congress intended "priority" to increase significantly opportunities for blind vendors.  That was certainly true in the analogous context of the R-S Act.  The statutory findings accompanying the 1974 amendments to the R-S Act, which added the term "priority" to the statute, state an intent to "adopt legislation to [the] end" of "doubling the number of blind operators on Federal and other property under the Randolph-Sheppard programs within the next five years."  R-S Act Amendments of 1974, Pub. L. No. 93-516, § 201(2), 88 Stat. 1617, 1622 (1974).

Given this intent, it is unlikely that Congress intended "priority" to confer upon SLAs only the right to be approached before states award contracts to other vendors.  The timing requirement alone, absent any other protections, would leave states free simply to approach their SLAs first, reject their offers, and

then open contracts for competitive bidding. SLAs would be afforded no meaningful priority at all.

For similar reasons, it is also unlikely that Congress intended "priority" to be met by the state's Tie Rule or Match Rule (which are, in any event, inconsistent with the timing requirement). Counsel for the state conceded the ineffectiveness of the Tie Rule in oral argument, noting that "the chances of [the Bureau] submitting exactly the same or higher bid [as other vendors] might be vanishingly slim" in a sealed bidding process. The Match Rule is also problematic. The state has not denied that the Bureau of Blind Services simply lacks the resources to match high bids. In both instances in which the Bureau has bid on contracts, it has been significantly outbid by private vendors. In 1997, the winning bid was from Coca-Cola Foods for $84,000; the Bureau bid $7,200. In 1999, the winning bid was from Good Morning Sales, Inc., for $283,577; the Bureau bid $32,650. Thus, as a practical matter, the Match Rule offers the Bureau no advantage at all. Congress created a priority requirement in § 111(b) because it recognized precisely this problem: that SLAs generally have difficulty offering the highest bids in a competitive bidding process.

Nor do we think that Congress intended to limit priority under § 111(b) in a way analogous to the provisions of the R-S Act governing the operation of cafeterias (rather than the placement of

vending facilities).  The R-S Act provides that

> [t]he Secretary [of Education], through the Commissioner, shall prescribe regulations to establish a priority for the operation of cafeterias on Federal property by blind licensees when he determines, on an individual basis and after consultation with the head of the appropriate installation, that such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided to employees, whether by contract or otherwise.

20 U.S.C. § 107d-3(e).  Had Congress intended to limit § 111(b) priority similarly, it could easily have done so.  The cafeteria provision, § 107d-3(e), was present in the R-S Act at the time Congress was drafting § 111(b).  See Pub. L. No. 93-516, § 206(e), 88 Stat. 1617, 1627 (1974).  Congress could have drafted § 111(b) to mirror the language of § 107d-3(e) instead of § 107(b), but it chose not to.

We conclude that the arbitration panel's interpretation should be upheld because it most closely adheres to Congress's likely intent in § 111(b).  Our interpretation is reinforced by the 1983 DOT Guidelines, supra, which allow the state to negotiate with other parties if the SLA signs a written waiver of its priority rights.

Our reading is further bolstered by the fact that New Hampshire itself seems to understand that Congress intends "priority" to impose a waiver requirement.  New Hampshire has enacted its own mini-R-S Act, N.H. Rev. Stat. Ann. § 186-B:9-15, which offers almost identical vending opportunities to the blind on

-59-

state property as offered on federal property under the R-S Act. Compare N.H. Rev. Stat. Ann. § 186-B:9-15, with 20 U.S.C. § 107 et seq. Although it does not use the term "priority," § 186-B:13 provides that

> No person in control of the maintenance, operation and protection of any state property may offer or grant to any other party a contract or concession to operate a vending facility unless:

> (a) He has notified blind services and has attempted to make an agreement with blind services for a licensed blind person to operate a vending facility; and

> (b) He has determined in good faith that blind services is not willing to establish a vending facility on such property.

The state statute, §§ 186-B:9-15, does not apply to this case only because New Hampshire has exempted interstate highway sites -- sites where New Hampshire needed federal permission to have any vending facilities at all -- from the statute's coverage. See N.H. Rev. Stat. Ann. § 230:30-a. Why New Hampshire carved out an exception, for property along the interstate highway system, from its normal adherence to R-S Act standards is unclear. But, to the extent that New Hampshire sought to mirror the R-S Act in § 186-B:9-15, it supports our view of what New Hampshire believes Congress to mean by "priority" under § 107(b) of the R-S Act and thus under § 111(b) of the STA Act.

**C.    Preemption of N.H. Rev. Stat. Ann. § 230:30-a**

-60-

The state argues, in the alternative, that even if the arbitration panel was correct about Congress's likely intent as to the meaning of priority, an administrative agency cannot find state law preempted unless Congress "clearly expressed" an intent to preempt state law. Because no such clear expression is present in § 111(b), the state argues that N.H. Rev. Stat. Ann. § 230:30-a is not preempted.

This argument is based on a mistaken understanding of the law of preemption. New Hampshire's obligations under § 111(b) are defined by federal law. New Hampshire may pass statutes implementing particular procedures for carrying out those obligations, as N.H. Rev. Stat. Ann. § 230:30-a does. But to the extent that those state laws directly conflict with the requirements of federal law, the Supremacy Clause requires that they be given no effect. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (citing U.S. Const. art. VI, cl. 2). This is true even in the absence of an express congressional statement of an intent to preempt. Id. ("In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law." (citing Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 204 (1983))). Here, § 230:30-a directly conflicts with the priority requirement of § 111(b). Section 230:30-a requires the "director of plant and property management" to "put out bids for the installation and

maintenance of the vending machines" and provides that "any bidder shall be eligible to bid for this service . . . ." This open bidding system conflicts with § 111(b)'s requirement that states first approach their SLAs and open the contract up to other bidders only after the SLA has waived its priority in writing. Section 230:30-a is therefore preempted.

## VI.

"While the state is constitutionally free to operate its own highway system, the federal government is not bound constitutionally or statutorily to grant federal highway funds to states which do not operate their systems in accordance with federal guidelines." State of Nebraska, Dep't of Roads v. Tiemann, 510 F.2d 446, 448 (8th Cir. 1975). Here, New Hampshire voluntarily entered into two agreements with the federal government, one under the STA Act and one under the R-S Act. As the panel found, the state of New Hampshire has violated those agreements.

For the reasons stated above, we **vacate** enforcement of the damages award and **dismiss** the damages claim; otherwise we **affirm**.

APPENDIX

The arbitration panel made the following findings of fact:

6. Based upon legislative history and statutory interpretation, the word "priority" as used in the Randolph-Sheppard Act, is defined as a right of first refusal.

7. Based upon memoranda issued by the U.S. Department of Transportation after the passage of Section 111(b) of TEA-21 [i.e., the STA Act], and based upon the meaning of "priority" as interpreted under the Randolph-Sheppard Act, N.H. Blind Vendors and state employees working with the N.H. SLA in 1983 believed that the N.H. SLA was entitled to, and should receive, a right of first refusal to operate vending machines at rest areas on the Interstate Highway System.

8. The N.H. SLA could have taken advantage of its priority under Section 111(b) of TEA-21 by either having licensed blind vendors operate and maintain the machines, or by subcontracting with private vendors to operate and maintain the machines.

9. The N.H. SLA was not given a right of first refusal to operate machines at any of the rest area sites prior to the New Hampshire Department of Administrative Services putting the sites out for competitive bidding.

10. Had the N.H. SLA been given a right of first refusal to operate machines at any rest areas in New Hampshire, it would have placed machines at those sites through its licensed blind vendors or by hiring private vendors as subcontractors.

11. Despite the passage of RSA 230:30-a, various individuals at Administrative Services negotiated with the N.H. SLA in order to provide N.H. SLA with commissions from the income earned at vending machines at rest areas on the Interstate Highway System in exchange for a waiver of its right to a priority.

17. Despite long-standing efforts by the N.H. Blind Vendors and N.H. SLA to negotiate with Administrative Services to receive a priority to operate vending machines at rest areas, the N.H. SLA has been unsuccessful.

26. In New Hampshire the SLA has never received any commissions for any of the vending machines at any of the rest areas on the Interstate Highway System.

28. There is no evidence that the State of New Hampshire has ever made a good faith determination that the N.H. SLA was unwilling to operate machines at any rest area sites, nor is there any evidence that the N.H. SLA waived its right to such a priority in writing [except as to the Springfield location].

30. Since the enactment of RSA 230:30-a, the N.H. SLA's priority to operate vending machines on the Interstate Highway System has been intentionally violated by the State of New Hampshire.

It also made the following rulings of law under federal law:

A. The rest areas at Hooksett, Springfield, Salem, Seabrook, Canterbury, Lebanon, Sanbornton and Sutton on Interstate Highways 89, 93, and 95 in New Hampshire are subject to the provisions of Section 111(b) of TEA-21, and its predecessors. Section 111(b) of TEA-21 gives states the authority to place vending machines at rest areas on the Interstate Highway System if they chose to do so, however by doing so a priority must be given to the SLA.

B. In accordance with Section 111(b) of TEA-21, and based upon litigation of the Randolph-Sheppard Act, 'priority' requires that SLAs be approached and be given a right of first refusal before any other entity be approached to operate such sites.

C. The SLA must waive its right to a priority in writing before it approaches any other entity to operate machines at rest areas on the Interstate Highway System.

T. RSA 230:30-a, which excludes the applicability of RSA 186-B:9-15 at rest areas on the Interstate Highways in New Hampshire, is in direct conflict with Section 111(b) of TEA-21, because New Hampshire's state-owned rest areas on the Interstate Highways in New Hampshire are governed first and foremost by TEA-21, and based upon RSA 230:30-a the N.H. SLA is not given a priority to operate vending machines at rest areas, nor does it receive any of the commissions earned at such rest areas.

U.    RSA 230:30-a is preempted by Section 111(b) of TEA-21.


W.    Under RSA 230:30-a, the N.H. SLA is expected to compete with private vendors, and thus has no priority to operate vending machines at rest areas on the Interstate Highway System.

(internal citations omitted)